IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

OCTOBER 1996 SESSION



FILED

September 30, 1997

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | NO. 01C01-9601-CC-00011 |
| | ) | |
| Appellee | ) | MAURY COUNTY |
| | ) | |
| v. | ) | HON. JIM T. HAMILTON, JUDGE |
| | ) | |
| MICHAEL AMOS | ) | (Attempted Second Degree Murder, |
| | ) | Especially Aggravated Robbery) |
| Appellant | ) | |
| | ) | |

FOR THE APPELLANT

Michael D. Noel
2400 Crestmoor Road, Ste. 318
Nashville, Tennessee 37215

L. Robert Grefseng
28 Public Square
Columbia, Tennessee 38401

FOR THE APPELLEE

John Knox Walkup
Attorney General and Reporter
450 James Robertson Parkway
Nashville, Tennessee 37243-0493

John R. Collier
Assistant Attorney General
450 James Robertson Parkway
Nashville, Tennessee 37243-0493

T. Michael Bottoms
District Attorney General
P.O. Box 459
Lawrenceburg, Tennessee 38464

Jesse Durham
Assistant District Attorney General
P.O. Box 1619
Columbia, Tennessee 38402

J. Lee Bailey, III
Assistant District Attorney General
P.O. Box 1619
Columbia, Tennessee 38402

OPINION FILED:_____

AFFIRMED

WILLIAM M. BARKER, JUDGE

## Opinion

The appellant, Michael Amos, appeals as of right his convictions following a jury trial for the offenses of attempted second degree murder and especially aggravated robbery. He argues on appeal that:

(1) The trial judge erred when he did not grant the appellant a continuance when a material alibi witness failed to appear on the day of the trial;

(2) The trial judge erred when he did not allow the appellant to read prior recorded testimony of the missing alibi witness into evidence;

(3) The trial judge erred when he refused to allow the appellant to use a prior recorded statement to impeach the State's "eyewitness" to the crimes;

(4) The trial judge erred when he refused to allow a photograph of the appellant wearing rings on his left hand into evidence; and

(5) The evidence was insufficient to support the conviction of especially aggravated robbery.

Following a careful review of the record on appeal and the applicable law, we find that no reversible error appears on the record, and we, therefore, affirm the appellant's convictions.

## Factual Background

On January 17, 1995, Officer William Doelle of the Maury County Sheriff's Department and Officer William Gault from the Columbia Police Department enlisted the services of an undercover informant, Mike Wiley, to assist them in attempting to make undercover drug purchases in a housing project operated by the Columbia Housing Authority. The officers provided Wiley with five twenty-dollar bills for his use in attempting to make street purchases of crack cocaine. The officers planned to monitor any drug transactions through a concealed microphone placed on the undercover informant. The officers also hid a video camera in the informant's van in order to establish a visual record of any transaction.

To execute the undercover operation, the informant drove around the south-side part of the housing authority until he made contact with the appellant and another unidentified African-American man. One of the two men told Wiley to drive around the block one more time and then come back. When the informant returned, the appellant and the other man approached the van and Wiley told them that he wanted to buy a twenty-dollar rock of crack cocaine. The unidentified man handed the informant a white rock which at first appeared to be crack cocaine, but when Wiley looked closer he thought it looked more like a piece of wax. Wiley asked the two men if the rock was real cocaine. In response, the appellant pulled out a gun and held it to the informant's head, saying, "Is this real?" The appellant also demanded that Wiley return the cocaine-like substance, and for some unknown reason, Wiley refused to relinquish the substance. At that time, the appellant fired the pistol three times into the driver's compartment of the van with the last bullet striking Wiley's arm.

On South Way Boulevard, which was approximately one block away, Officers Doelle and Gault were monitoring the transaction through the radio transmissions from the van. They heard the informant first say, "Don't shoot!," and then a few seconds later say, "I've been shot!," as he drove off in the van.[1] The officers immediately started driving towards the scene of the shooting and on the way they intercepted the informant who told them that he had been shot and that he was going to the hospital. As the officers got closer to Sycamore Street, they saw two African-American men running south on West Willow Street, with one man wearing what appeared to be tan or brown coveralls and the other man wearing a Dallas Cowboy's starter jacket. Officer Gault got out of the car and began pursuing them on foot up an embankment and behind some houses. He then saw the two men running through a creek close to the appellant's house, and he intercepted the appellant a few seconds later in his

---

[1]The microphone and the transmission equipment were designed to cut out loud noises, such as gun shots, to protect the hearing of the listener. Therefore, the sound of the gun fired inside the car was not audible to the officers.

driveway at 112 Sycamore Street.[2]  The officers never apprehended the man wearing the Dallas Cowboy's jacket.

At the time of his arrest, the appellant was wearing tan heavy-duty pants which, according to the testimony of Officer Beth Lovett, were wet around the ankles.  The appellant was also wearing a few gold chains and a gold watch on his left wrist, and he was in possession of a wrench and some miscellaneous items, including some change and possibly two rings.  The rings were found in his pocket, not on his fingers, when he was arrested.  On the porch of the house, the police found an aqua-colored ball cap, which, according to the officer's observation, was similar to a cap worn by one of fleeing men.  Several police officers searched the area surrounding the crime scene and the appellant's house, but they did not find a tan jacket, a face mask worn by Wiley's assailant, the weapon used in the shooting, any drugs, or the twenty-dollar bill that changed hands during the drug transaction.  A sample taken from the appellant's hands, however, revealed that both were covered with gunshot residue and that the palm of appellant's left hand had sufficient gunshot residue to indicate that he could have fired a weapon with that hand.

At trial, both the informant and an independent eyewitness identified the appellant as the shooter.  They testified that the appellant, during the drug transaction, was wearing what appeared to be tan heavy-duty coveralls or a matching jacket and pants looking like coveralls, a face mask, and an aqua-colored ball cap.  They further testified that the unidentified man was wearing a Dallas Cowboy's starter jacket and a face mask.  The video recording made during the transaction was introduced into evidence by the State and was played before the jury three times.[3]  Apparently, the

---

[2]Officer Gault testified that it took one and one-half to two minutes from the time they realized that the informant had been shot until he arrested the appellant.  He also testified that the foot chase lasted approximately forty-five seconds and that during that time he lost sight of the appellant one time for approximately ten seconds and another time for approximately five to six seconds.

[3]Although the video recording was introduced and marked as State's Exhibit 1 during trial, it was never made a part of this record on appeal.  Consequently, we were unable to view the contents of the recording during our review of the record in this case.

video depicted the two assailants wearing the clothing as identified by the two witnesses, and it also showed that the shooter was left-handed and that he was wearing a gold watch on his left hand, but no rings on that hand.

Six witnesses, including the appellant, testified for the defense. The appellant testified that earlier on the day of the shooting he had gone to a body shop to obtain a repair estimate. He said that he was accompanied by Steve Kinnard. After obtaining his estimate, he testified that he returned to his home at 112 Sycamore, a short distance from the shooting. The appellant said that although he was on the street where the shooting occurred, he was some distance away. When he heard gunfire, the appellant testified that he left the area and was in his driveway when confronted and arrested by Officer Gault. He testified that he had been wearing his rings earlier in the day, but had removed them and placed them in his pocket in order to work on a motorcycle.

Nathan Hill testified that he was sitting outside near the location of the shooting. He testified that he saw the appellant some distance away from the van at the time of the shooting and that the appellant was with Steve Kinnard.

William Hall, appellant's next-door neighbor, testified that he heard what sounded like firecrackers and thereafter saw some boys running in the back of his house down a creek and toward the highway away from his house.

Milton Murray testified that he had known the appellant for twenty years and opined that the appellant was truthful and honest. Murray acknowledged that he was aware that the appellant had previously been convicted of robbery.

The appellant's mother testified that her son lived with her and did not own a ski mask. She had no knowledge of any of the events surrounding the shooting, but she testified that her son owned rings that he normally wore.

Based upon the foregoing evidence, the jury found the appellant guilty of attempted second degree murder and especially aggravated robbery. The trial court later sentenced the appellant to a term of twelve years imprisonment for his conviction

of attempted second degree murder and to a term of twenty-five years for his conviction of especially aggravated robbery. He was also assessed a fine of $15,000 for each offense. The sentences were ordered to be served consecutively to each other and consecutive to a previous six-year sentence for an earlier robbery conviction.

I.

The appellant first contends that the trial court erred in denying his motion for a continuance when a material alibi witness failed to appear on the day of the trial. This issue is without merit.

The appellant's theory at trial was that even though he was present on the street when the shooting occurred, he was standing next to Steve Kinnard some distance away from the shooting and that upon hearing the gunshots, he and Kinnard left the street for the appellant's house. To support his theory, the appellant planned to call two witnesses who would testify that they had seen or had been standing next to the appellant when the shooting occurred. One of those witnesses, Steve Kinnard, failed to appear at trial. The appellant's counsel, believing that Kinnard would voluntarily appear at trial, failed to issue a subpoena to secure his attendance until the day before trial. After learning that the subpoena had not been served on Kinnard and that Kinnard was not present on the morning of trial, counsel for the appellant made an oral motion for a continuance. The motion was not supported by counsel's affidavit.

Whether to grant or deny a motion for a continuance is within the trial court's sound discretion and the denial of such a motion will not be overturned on appeal absent a clear showing that the trial court abused its discretion to the prejudice of the defendant. State v. Melson, 638 S.W.2d 342, 359 (Tenn. 1982); Baxter v. State, 503 S.W.2d 226, 230 (Tenn. Crim. App. 1973). When a continuance is sought because a witness is unavailable, the party seeking to offer that witness is required to file a written motion which sets forth the grounds for the continuance with particularity

6

unless the trial court permits an oral motion. State v. Dykes, 803 S.W.2d 250, 256 (Tenn. Crim. App. 1990), see Tenn. R. Crim. P. 47. The motion must be supported by an affidavit stating:

> (a) the substance of the facts that the accused expects to prove through the unavailable witness, (b) sufficient facts to establish the relevance and materiality of the unavailable witness, (c) that the testimony would be admissible if the witness were available, (d) that the testimony is not merely cumulative to other testimony, (e) that the witness will be available at a later date, and (f) diligence was exercised to obtain the presence of the witness.

Dykes, 803 S.W.2d at 256-57 (footnotes omitted); see State v. Zirkle, 910 S.W.2d 874, 884 (Tenn. Crim. App. 1995); see also Tenn. Code Ann. § 40-18-103 (1990). "The failure to file a . . . properly drafted affidavit, standing alone, will justify the denial of the motion without a hearing." Dykes, 803 S.W.2d at 257.

In this case, appellant's oral motion for continuance was not supported by affidavit and therefore, the trial judge was well within his discretion in denying the motion. Moreover, even if an affidavit had been filed, it is unlikely that the appellant would have satisfied the Dykes test. First, the testimony of Steve Kinnard was cumulative to that of other witnesses that the appellant presented at trial. Moreover, the appellant failed to show diligence in insuring that Steve Kinnard would be present at trial. As indicated above, the appellant's counsel did not issue a subpoena for Kinnard until one day before the trial.

II.

The appellant next contends that the trial court erred in not allowing the prior recorded testimony of Steve Kinnard into evidence. This issue is without merit

On February 7, 1995, the Maury County Circuit Court held a probation revocation hearing for the purpose of determining whether or not to revoke the appellant's probationary sentence from a previous offense. Apparently, the ground relied upon by the State for the probation revocation was the appellant's participation in the present offenses. At that hearing, Steve Kinnard testified that he and the appellant were standing together near the appellant's house when the shooting

occurred and that the appellant therefore could not have fired the pistol into Wiley's van. Since Kinnard was never served with his subpoena to be a witness in the present case, the appellant argues that Kinnard was an "unavailable" witness and that his testimony from the probation revocation hearing should have been admitted as former testimony under Tennessee Rule of Evidence 804(b)(1).

Tennessee Rule of Evidence 804(b)(1) provides that when a witness is unavailable to testify at trial, his or her former testimony will be allowed into court if it was:

> [t]estimony given as a witness at another hearing of the same or a different proceeding or in a deposition taken in compliance with the law in the course of the same or another proceeding, if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination.

Id. For a witness to be considered "unavailable," the party offering the testimony has to show that the witness "is absent from the hearing and the proponent of [the] statement has been unable to procure the declarant's attendance by process." Tenn. R. Evid. 804(a)(5). This issue is most common in cases where state prosecutors seek to introduce former testimony of "unavailable" witnesses. In those cases, courts have required prosecutors to satisfy a two-prong test to protect the defendants' Sixth Amendment right to confrontation. This test provides that "it must be shown that the [witness] whose prior testimony is offered at trial is truly 'unavailable' after a good faith effort by the prosecutorial authorities to obtain his presence . . . [and that] once it is shown that he is 'unavailable' the evidence must carry its own 'indicia of reliability.'" State v. Arnold, 719 S.W.2d 543, 548 (Tenn. Crim. App. 1986) (quoting Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 2539, 2542-43, 65 L.Ed.2d 597 (1980)).

We find that this test should apply equally to prosecutors and defendants who seek to admit the former testimony of an "unavailable" witness under Tennessee Rule of Evidence 804(b)(1). We will, therefore, analyze this case under the above stated test.

8

Here, we find no evidence that the appellant made a good-faith effort to obtain Kinnard's presence at trial. The appellant's counsel knew that Kinnard disappeared one week before the trial, however, the appellant has failed to introduce any evidence that he attempted to locate Kinnard during that week. The record indicates that the appellant had access to Kinnard's girlfriend and that the appellant's mother was able to relay information and assist in locating Kinnard. Furthermore, the appellant did not try to subpoena Kinnard until the day before trial. Thus, we conclude that the appellant failed to make a good-faith effort to ensure Kinnard's presence at trial. Accordingly, we need not address the second prong of the test or discuss whether Kinnard's testimony qualified as former testimony.

III.

The appellant's next contends that the trial judge erred when he refused to admit in evidence a photograph of the appellant wearing rings on his left hand. This issue is without merit.

The video recording of the drug transaction apparently showed that the individual firing the gun into the van wore no rings on his left hand. The appellant claimed that he almost always wore two gold rings on his left hand and, therefore, he could not have been the person firing the gun on the video tape. At trial, the appellant attempted to prove this claim through witness testimony and an undated photograph of himself wearing two rings on his left hand. Immediately before he attempted to introduce the photograph, he testified that he had not been wearing the two rings when he was arrested after the shooting. The trial judge excluded the photograph stating that it was irrelevant.

All relevant evidence is admissible unless it is specifically excluded by state or federal constitution, statute or rule. Tenn. R. Evid. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would without the evidence." Tenn. R. Evid. 401. Whether evidence is relevant is

9

within the trial court's sound discretion and its findings will not be overturned absent a clear showing of abuse of discretion. State v. Leath, 744 S.W.2d 591, 593 (Tenn. Crim. App. 1987); Gray v. State, 235 S.W.2d 20 (Tenn. 1950).

We find that the trial court did not abuse its discretion when it excluded the photograph of the appellant wearing two rings on his left hand. Both the appellant and his mother had already testified that the appellant wore rings on his left hand. The photograph, which illustrated one undated instance in time, would have been cumulative to that testimony. Furthermore, the appellant failed to establish when the photograph was taken, and since rings can easily be removed and put back on, one picture of the appellant wearing rings a few weeks before the shooting has little, if any, relevance. See Hardy v. State, 519 S.W.2d 400, 402 (Tenn. Crim. App. 1974) ("[D]emonstrative evidence such as [a] photograph should be admitted with great caution where it is corroborative of evidence representing physical characteristics as transitory as long or short hair, sideburns, mustaches, or beards.").

Even if the photograph were relevant to a material issue of fact, we find that in light of the evidence in the record on appeal, the trial court's error would have been harmless beyond a reasonable doubt. Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a). The appellant was identified as the shooter by the informant and an independent eye witness, and the video recording also confirmed that the appellant and the shooter had similar characteristics and wore similar clothes.

IV.

The appellant next argues that the trial judge erred in refusing to allow counsel for the appellant to play a previously recorded audio taped interview of State witness Norm Hogue for impeachment purposes. This issue is without merit.

Before trial, the appellant's counsel conducted phone interviews with an eye witness, Norm Hogue, who had identified the appellant as the person firing the gun into the van. During the cross-examination of Hogue, the appellant sought to play the taped interviews to impeach Hogue by showing that his recorded statements

10

contained racial bias and were inconsistent with his testimony. After the appellant notified the trial court of his intention, the trial court, outside the presence of the jury, reviewed the statements and compared them to Hogue's testimony at trial. The trial court found that the statements were not impeaching.

The decision to admit or exclude evidence is left to the trial court's sound discretion and will not be disturbed unless it is arbitrarily exercised. State v. Hawk, 688 S.W.2d 467, 472 (Tenn. Crim. App. 1985); State v. Baker, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989). We have reviewed Hogue's testimony at trial and compared it to his recorded phone conversation with the appellant's counsel. We find no evidence that Hogue was racially biased against the appellant or that his phone conversation was inconsistent with his testimony at trial, even though he did express discontent with some of the activities that took place in the housing authority. We, therefore, find that the trial court did not arbitrarily limit cross-examination of the witness.

V.

The appellant next contends that the evidence introduced at trial was insufficient to support his conviction of especially aggravated robbery. Specifically, he asserts that the evidence presented at trial did not establish the elements of robbery, as charged, beyond a reasonable doubt. Although we find this to be a close issue, we conclude that the record sufficiently supports the judgment of the trial court.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in the light most favorable to the prosecution in determining whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We do not reweigh or re-evaluate the evidence and are required to afford the State the strongest legitimate view of the proof contained in the record as well as all reasonable and legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

11

Questions concerning the credibility of witnesses, the weight and value to be given to the evidence, and any factual issues raised by the evidence are resolved by the trier of fact, not this Court. Cabbage, 571 S.W.2d at 835. A guilty verdict rendered by the jury and approved by the trial judge accredits the testimony of the witnesses for the State, and a presumption of guilt replaces the presumption of innocence. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

A defendant challenging the sufficiency of the proof has the burden of illustrating to this Court why the evidence is insufficient to support the verdict returned by the trier of fact. This Court will not disturb a verdict of guilt for lack of sufficient evidence unless the facts contained in the record and any inferences which may be drawn from the facts are insufficient, as a matter of law, for a rational trier of fact to find the defendant guilty beyond a reasonable doubt. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In this case, the State charged the appellant with especially aggravated robbery. Count II of the indictment provided that:

> on or about the 17th day of January, 1995, in the State of Tennessee and County of Maury, that Michael Amos, before the finding of this indictment, did unlawfully and intentionally or knowingly, *obtain property, to-wit: Twenty ($20.00) Dollars in money*, with the intent of depriving Michael Wiley of the property and without his effective consent from the person of Michael Wiley by violence and accomplished by the use of a deadly weapon, to-wit: a gun as a result of which Michael Wiley suffered serious bodily injury . . . .(emphasis added).

The only testimony as to what took place during the drug transaction was presented by Michael Wiley and in pertinent part provided:

> Q.     Now, if you would, tell us what you did when you departed from where Officer Doelle was that day?
> A.     I was in my vehicle, and I was going down Polk Street. And I went down there a little ways, and I took a right. And there was a group of people standing out there, and I kind of eased by once, and I made the block, once again. And some people stopped and talked to me, and I told them I wanted to buy some crack. And they said, okay. Make the block.

And so, I made the block, again, and I pulled back up. And I didn't pull all the way up to the end of the road. I stopped back from there a little ways.

And two people approached me. And they come over to the car, and I told them to go to the other side. And they -- I told them, you know, to slam me a twenty. You know, I wanted a $20.00 rock.

And so this little guy in a Dallas Cowboy's jacket, he handed me the rock. And I looked at it, and it didn't look real. I said, man, is this real? And so, the taller guy, over there, he pulled a gun out, and stuck it to my head and said, is this real? And I said, yeah, that's real.

Q. Well, was this upsetting to you when that was done?

A. That's an understatement.

Q. Would it be fair to say that it scared the heck out of you?

A. It scared the you-know-what out of me.

Q. Did you say anything?

A. I didn't know actually what to say. I told him not to shoot me. I said, don't shoot me; don't shoot me. And he wanted the piece of whatever it was he give me back. I don't know why I didn't give it back. My brain wasn't working right. But I didn't give it back, and he proceeded to fire off rounds in the automobile. And about the third time he shot, he got me in the arm.

* * *

Q. Okay. Now, you mentioned that they were demanding back -- or this one was demanding back this item you had purchased. And was it you intention to be purchasing a rock of cocaine?

A. Yes, sir.

Q. Now, what about money? Was there any money? Did somebody get some money?

A. Yes, sir.

Q. And what was that? A $20.00 bill?

A. Yes, sir.

Q. And did you have some other monies in the vehicle, there?

A. Yeah. I had four more twenties in the vehicle with me. That was for to make other buys with.

Q. Was each buy -- how much was each buy supposed to be?

A. About a twenty.

The jury convicted the appellant of robbing Mr. Wiley of twenty dollars by violence with the use of a deadly weapon. The record demonstrates that the appellant stuck a gun to Mr. Wiley's head with the intent to threaten Mr. Wiley and deprive him of personal property. At that time, Mr. Wiley was in possession of five twenty-dollar bills and the white rock, purported to be cocaine. There is no evidence that Mr. Wiley gave a twenty-dollar bill to the appellant to complete a purchase of the white rock. To the contrary, Mr. Wiley testified that "someone" took one of the twenty-dollar bills from him while the appellant pointed his gun at Mr. Wiley and thereafter fired three shots

13

into the cab of the van.  The appellant and his accomplice were the only two individuals near enough to Wiley to take the money.

Upon viewing this evidence in a light most favorable to the State, we conclude that the jury was justified in finding beyond a reasonable doubt that the appellant was guilty of robbery under especially aggravating circumstances.  The appellant's conviction is based upon sufficient evidence.

Accordingly, the judgment of the trial court is affirmed.

14

_____
WILLIAM M. BARKER, JUDGE


CONCUR:


_____
JOE B. JONES, PRESIDING JUDGE


_____
J. STEVEN STAFFORD, SPECIAL JUDGE